IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JAMES LOCKHART,

    Plaintiff,

vs.

CRST, Inc., and, CRST International, Inc., and, CRST Van Expedited Inc.,

    Defendants.

No. C08-0013

RULING ON MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   *Lockhart's Termination and the March 2005 Incident with Maynard.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   *The April 2004 Incident with Thomas.* . . . . . . . . . . . . . 6

IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT. . . . . . . . . . 9

V.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    A.   *Lockhart's Prima Facie Case.* . . . . . . . . . . . . . . . . . . 11
    B.   *CRST's Legitimate Non-Discriminatory Reason.* . . . . . . . . 14
    C.   *Pretext.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VI.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII. ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 12) filed by Defendants CRST, Inc., CRST International, and CRST Van Expedited, Inc. (collectively "CRST") on December 5, 2008; the Memorandum in Support

of His Resistance to Defendants' Motion for Summary Judgment (docket number 17) filed by Plaintiff James Lockhart on December 30, 2008; and the Reply to Plaintiff's Resistance to Motion for Summary Judgment (docket number 22) filed by Defendants on January 13, 2009. Pursuant to Local Rule 7.c, the Motion for Summary Judgment will be decided without oral argument.

## II. PROCEDURAL BACKGROUND

Plaintiff James Lockhart ("Lockhart") timely filed a charge of race discrimination in employment against CRST with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC"). On June 9, 2006, the ICRC issued a "No Probable Cause" decision and dismissed Lockhart's complaint.[1] On June 29, 2007, the ICRC denied re-opening his complaint.[2] On November 7, 2007, the EEOC issued Lockhart a Dismissal and Notice of Rights, including notice of his right to sue in federal or state court.[3]

On February 5, 2008, Lockhart filed a Petition (docket number 2) alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* On March 7, 2008, CRST filed an Answer (docket number 6). On May 8, 2008, both parties consented to proceed before a United States Magistrate Judge, pursuant to the provisions set forth in 28 U.S.C. § 636(c). Trial is scheduled before the undersigned on May 18, 2009. CRST filed the instant Motion for Summary Judgment (docket number 12) on December 5, 2008.

## III. RELEVANT FACTS

### A. Lockhart's Termination and the March 2005 Incident with Maynard

Lockhart, an African-American male, was employed by CRST as a long-haul truck driver from August 7, 2003 to March 31, 2005. Lockhart was terminated from

---

[1] *See* Defendants' Appendix at 1-2 (Order of No Probable Cause).

[2] *See* Defendants' Appendix at 3 (Order Denying Reopening).

[3] *See* Lockhart's Petition (docket number 2), Exhibit A.

2

employment on April 1, 2005, for misconduct. The "Comments" section of Lockhart's "Termination Record" provides that:

> Co[-]driver backed into a Crete truck in Gary, In[diana] at the Pilot truckstop. Malone driver William Maynard thought that they were not going to report it. William had the Crete driver paged and confronted [Lockhart] about the incident. They got into an argument and [Lockhart] punched him in the face. [Lockhart] reports as self defense. Term[inated] due to not being the first incident.

(*See* Defendants' Appendix at 4.)

The incident between Lockhart and William Maynard ("Maynard") occurred on March 29, 2005. In an affidavit, George Brandmayr ("Brandmayr"), CRST's Safety Manager, stated that after learning about the altercation between Lockhart and Maynard, he spoke with both drivers by phone in order to learn what had happened. In an email dated March 29, 2005, Brandmayr reported his conversation with Maynard. The email states that Maynard witnessed Lockhart's co-driver back into a Crete truck, resulting in damage to the front-end of the truck.[4] Next, Maynard observed Lockhart and his co-driver look to see if the Crete truck was unoccupied.[5] Finding the Crete truck empty, Lockhart and his co-driver moved their truck to a different area of the truck stop.[6] Maynard assumed Lockhart and his co-driver were trying to dodge the accident, so he informed the Crete driver about what had happened.[7] According to Maynard, Lockhart found out that he had informed the Crete driver about the accident, words were exchanged, and then Lockhart punched him in the face.[8]

---

[4] *See* Defendants' Appendix at 5 (Brandmayr's Email).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

3

Brandmayr also spoke with Lockhart. In his affidavit, Brandmayr states that Lockhart admitted punching Maynard in the face because Maynard was "getting in his face."[9] In deciding the appropriate discipline for Lockhart, Brandmayr considered two factors: (1) Lockhart's involvement in an altercation with a co-driver in 2004, and (2) the fact that even if Maynard provoked him, Lockhart had other options than punching Maynard in the face. Brandmayr concluded that Lockhart's actions warranted termination because Lockhart "admitted that he punched Mr. Maynard in the face, and because this was not the first time he had been involved in a physical altercation as [CRST's employee]."[10]

Lockhart offered a differing version of the incident with Maynard. In his deposition, Lockhart described the events as follows:

> Q: Did either one of you exit the truck after your truck struck this other truck?
> A: Yes, sir. . . .
> Q: Then what happens?
> A: I get out of the truck to check the damages and stuff, and during that time[.] . . .
> A: At that time, Mr. Maynard approached the truck with a pad and a pencil. . . .
> A: [Maynard s]tarted writing down truck information and the other truck information, and he went inside the truck stop, paged for the driver of the truck and came back out of the truck stop, came back over near to my truck, and I looked at him and I just said, 'Excuse me. What were you doing writing down information, stuff like that?'
>
> And I told him--asked him, I said, 'I don't know how long you been driving a truck, but I do know that there's drivers out here that would get highly upset for what you just did.' He goes, 'Oh, what was that?' I said, "Well, you came over and you're writing down-- You didn't see anything. You're writing down information and stuff on trucks and stuff like that.

---

[9] *See* Defendants' Appendix at 29-30 (Brandmayr's Affidavit).

[10] *Id.* at 30.

> There's drivers that get upset about that, take that the wrong way and may want to hurt you or jump on you,' something like that. I said, 'You may want to be careful about that.'
>
> He got upset. Got mad and just started saying all kind of cussing words, and I told him, I said, 'Look, I'm not disrespecting you. I'd appreciate it if you don't disrespect me.' And he went from that to saying N words and all kind of other stuff and, you know, and again, I looked at him, I told him, I said, 'Look, man, I don't know what your problem is, but I'm not your problem, you know.'
>
> He got very loud, and I don't remember--recall what I said to him, but it was in reference to what I had repeated, I believe, again to him, and he balled his fist up and raised his hand and launch--in a launching position toward me. When he done that, I just automatically defended myself from his approach.
>
> Q: What did you do to defend yourself?
> A: I struck him.
> Q: Where?
> A: I don't remember exactly where. All I know is that it just happened so fast, you know. I tried to stop his approach on me.
> Q: Did you hit him in the face?
> A: Maybe. I believe so.

(*See* Defendants' Appendix at 27; Lockhart's Deposition, p. 54, l. 3 - p. 56, l. 23.)

Gary Police officers were dispatched to the truck stop on a disturbance between two male subjects, Lockhart and Maynard. Officer Highlan submitted a report which provided that Lockhart told him he "defended himself" by punching Maynard once in the face.[11] Lockhart told Officer Highlan that he punched Maynard because Maynard was "approaching him in a possibly violent manner. Mr. Lockhart stated Mr. [Maynard] was cussing and swearing at him and using racist language."[12] According to Officer Highlan, Maynard told him that "he was in fact 'going after' Mr. Lockhart," when Lockhart

---

[11] *See* Lockhart's Appendix at 20, Exhibit 7 (Officer Highlan's Report).

[12] *Id.*

5

punched him.[13] Both Lockhart and Maynard decided not to press charges against each other. Officer Highlan also noted that two unidentified witnesses approached him and stated that Maynard "started the hole [sic] incident and that they would be more than happy to testify if Mr. Lockhart wanted to press charges."[14] Again, Lockhart declined to press charges against Maynard.

### B. *The April 2004 Incident with Thomas*

In April 2004, Lockhart was paired with Ulysses Thomas ("Thomas"), another African-American driver, for a trip to Florida. In his deposition, Lockhart testified as follows:

> Q: Tell me as best you can what you remember about the incident you had with Mr. Thomas.
> A: Well, I remember we'd made it to--I don't remember the location in Florida. I drove there. I was out of hours, and we received our load information, and I woke Mr. Thomas up, you know, for his turn to drive, and Mr. Thomas jumped down off the truck, got into my face and just literally cussed me out--company, too--and cursing and saying he wasn't going to do anything.
>
> And I went to the pay phone and called Ben Fehl and told him about the situation. I get back to the truck, Ben had sent some messages on the telephone--not telephone, but the Qualcomm, and Mr. Thomas had read it and he found out that I had asked for him to be removed from the truck because of his attitude, and he got very upset about that, and there was trouble on the truck ever since, during the time that he was there.
> Q: When you say, 'there was trouble in the truck ever since,' you mean trouble with you?
> A: Yes.

(*See* Lockhart's Appendix at 4-5; Lockhart's Deposition, p. 33, l. 18 - p. 34, l. 16.) According to Lockhart, he and Thomas continued to have problems with each other throughout the entire day. For example, at one point during the day, Lockhart moved

---

[13] *Id.*

[14] *Id.*

6

Thomas' duffle bag and a plate of food from the floor of the truck to their proper storage spaces. Lockhart claims that Thomas became violent in response to moving the bag and food.[15] Later, in the evening, an altercation occurred between Lockhart and Thomas:

> Q: And what happened that night?
> A: Well, after finally talking with Ben and--He insisted on me finishing, completing the run with Mr. [Thomas] on the truck. He had sent this message that once we got back to Atlanta, he would remove him from the truck. And Mr. Thomas just got crazy at that point and led me to believe that he was going to do bodily harm to me.
>
> So at that point it led up to the police coming out, and they saw that he had a problem. They didn't take him off the truck immediately because they told me they couldn't take him off the truck. They wanted me to call the company. I did that, I called the company, and they still wouldn't. . . .
>
> A: The dispatcher working with Kevin told me that Kevin said he don't want to talk to me anymore, that there was a truck en route to pick up the load. And [Mr. Thomas] just got so violent to the point where, you know, I just looked at him and told him if he tried to hurt me, I was going to defend myself at all costs, and it resulted in me telling him that, and I guess he saw that I wasn't kidding.
>
> He went and first called--He first called police out, and they came out and saw that he was the problem, and they spoke to both of us and me, and they told me, said, 'Well, if he starts anymore trouble, call them back out.'
>
> So they were gone about maybe a minute, two at the most, and when I returned back to the truck, I found all my belongings thrown all over the place, top bunk,

---

[15] *See* Defendants' Appendix at 26; Lockhart's Deposition, p. 44, l. 24 - p. 45, l. 10 ("Mr. Thomas had a plate of seafood laying on the floor, and his duffle bag was between both seats and up against the gear shift, and I had asked Mr. Thomas numerous times politely if he would put his duffle bag where it belongs under the bunk in the compartment and if he would pick up the food off the floor. He wouldn't do that, so I picked up the food from the floor, after it started smelling, and placed the duffle bag underneath the bunk where it was, and he got very violent about that[.] . . .").

> everywhere, and I started putting my stuff back in place, and Mr. [Thomas] approached me again very violently and verbally. I did what the officers said. I went to the phone and called them back. They came out and told Mr. Thomas to pack his stuff, they was taking him off the truck.
>
> And during that process, an officer and I was talking. The other officer was between the truck and the--and me, and Mr. Thomas had picked up my hammer and raised it up in the air in a position to launch toward me is when the officer tackled him. Stopped his approach to me with the hammer, and they put him in handcuffs and took him off.

(*See* Lockhart's Appendix at 6; Lockhart's Deposition, p. 39, l. 17 - p. 41, l. 25; and Defendants' Appendix at 26; Lockhart's Deposition, p. 42, ll. 1-4.)

According to CRST's record of the April 2004 incident involving Thomas and Lockhart, Thomas claimed that: (1) Lockhart told him to get out of the bottom bunk so Lockhart could sleep there; (2) in response to Lockhart's request to move bunks, Thomas asked Lockhart whether they were going to need find new driving partners; (3) Lockhart pulled a corkscrew on him; and (4) because Lockhart pulled a corkscrew, Thomas called the police.[16] CRST's record also contains Lockhart's version of the incident. Lockhart claimed that: (1) he asked Thomas to get up and do his drive shift; (2) Thomas refused, jumped out of his bunk, and started swearing at Lockhart; (3) Lockhart felt like he was being jumped by Thomas, so he retrieved his pocket knife from his tool box and put the knife in his pocket "in case he needed it"; and (4) Lockhart called the police. The record provides that the police showed up and Lockhart claimed Thomas came at him and the police with a hammer. The police "slammed" Thomas to the ground and handcuffed him. Thomas claimed that he was "just showing police that [Lockhart] had a hammer in the truck."[17] The record also states that no arrests were made. Neither driver provided a

---

[16] *See* Defendants' Appendix at 6.

[17] *Id.*

8

police report of the incident to CRST. Lastly, the record notes that Lockhart provided a witness statement from an employee at the truck stop who witnessed Thomas acting belligerent inside the truck stop and in the parking lot.[18]

Other facts that are significant for making a determination on CRST's Motion for Summary Judgment will be discussed, as necessary, in the Court's consideration of the legal issues presented.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see*

---

[18] *Id.*; *see also* Lockhart's Appendix at 14, Exhibit 3 (Witness Statement from Angelo Martinez). In the witness statement, Martinez states that Thomas was "very loud" and "very rude" toward customers and staff at the truck stop. Martinez also states that police officers came to the truck stop and escorted Thomas to benches outside of the truck stop. At the benches, the officers talked to Thomas "about his attitude and for him to calm down." *Id.* According to Martinez, the officers left but had to return because Thomas "was starting stuff over with [his] driving partner." *Id.* Martinez noted that Thomas was taken to the ground by the police and handcuffed. *Id.*

*also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (same). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. DISCUSSION

Title VII of the Civil Rights Act of 1964, makes it unlawful for an employer to discharge an employee on the basis of his or her race. *See* 42 U.S.C. § 2000e-2(a)(1); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006). Lockhart presents no direct evidence of intentional race discrimination, but rather bases his claim on circumstantial evidence. Therefore, the Court applies the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 729 (1973) to Lockhart's race discrimination claim. *Jackson v. United Parcel Service, Inc.*, 548 F.3d 1137, 1140 (8th Cir. 2008); *Fields v. Shelter Mutual Insurance Co.*, 520 F.3d 859, 863-64 (8th Cir. 2008). Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie case of discrimination. *Fair v. Norris*, 480 F.3d 865, 869-70 (8th Cir. 2007). If the plaintiff does so, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the employment decision. *Id.* at 870 (citing *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir. 2002)). If the employer provides such a reason, then the burden shifts back to the plaintiff to present evidence that the employer's reason was a pretext for intentional discrimination. *Id.*

## A. Lockhart's Prima Facie Case

In order to establish a prima facie case of race discrimination, Lockhart must show that (1) he is a member of a protected class, (2) he was meeting the legitimate job expectations of his employer, (3) he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class were treated differently. *Fields*, 520 F.3d at 864 (citing *Carpenter v. Con-Way Central Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007)). CRST does not dispute that Lockhart meets the first three requirements of his prima facie case. Lockhart is an African-American, his overall job performance was "average,"[19] and he was discharged from employment.

CRST contends, however, that Lockhart fails to meet the final element of his prima facie case. CRST argues that Lockhart is unable to show that similarly situated white employees were treated more favorably than Lockhart was treated. Specifically, CRST maintains that Lockhart cannot show that white employees who engaged in fighting were not terminated; and therefore, were treated more favorably than he was treated. CRST points out that seven out of nineteen employees terminated for fighting in 2005 were white.[20]

Lockhart argues that he was treated differently from similarly situated employees because he was not at fault for the incidents with Thomas and Maynard. Lockhart maintains that Thomas instigated their altercation. Lockhart also claims that when he punched Maynard in the face, he was acting in self-defense. Thus, Lockhart contends that he was treated differently because he was disciplined for an altercation that was not his fault and for protecting himself from an individual who was acting violently toward him, while similarly situated employees were not disciplined for altercations that they did not cause or for acting in self-defense when other employees attacked them. Specifically, Lockhart points out that:

---

[19] *See* Defendants' Appendix at 4 (Notice of Personnel Action Termination Record).

[20] *See* Defendants' Appendix at 7.

11

> The co-drivers of Larry Moore, Patrick Turner, Dean Allen, Reginald Kelley, and Elbert Bilbrey were all assaulted by these employees and there is no evidence that any of the assaulted co-drivers were in any way disciplined for their involvement in these altercations. . . . Mark Wilke's [sic] co-driver, Sam Sherrod, was choked by Mr. Wilkes on one occasion, described as an 'incidence between the two' [sic] which they purportedly worked out amongst themselves, and assaulted by Mr. Wilkes on a second occasion. There is no evidence that Mr. Sherrod was in any way disciplined for his involvement in either of these altercations.
>
> Samuel Karugu's co-driver engaged in a verbal argument with Mr. Karugu prior to Mr. Karugu assaulting him/her. There is no evidence that Mr. Karugu's co-driver was disciplined in any manner for involvement in this altercation. John Bennet's employment was terminated after he threatened to kill CRST staff and to beat up his co-driver, and he had to be escorted off of the truck by law enforcement. There is no indication that Mr. Bennet's co-driver, Michael Johnson, a white male, was disciplined for involvement in this altercation. *The defendant treated these other, non-black, employees more favorably than [Lockhart], in that these employees were not disciplined, even though all of the evidence before the defendant clearly showed that [Lockhart] had done nothing in contravention of company policy and that Thomas had been the aggressor and had attempted to assault both [Lockhart] and law enforcement.*

(See Lockhart's Brief at 19-20.) (Emphasis added; citations omitted.)

To prove the fourth element of his prima facie case, Lockhart must set forth "facts that similarly situated employees, who are not African-Americans, were treated differently." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850-51 (8th Cir. 2005) (citing *Wheeler v. Aventis Pharmaceuticals*, 360 F.3d 853, 857 (8th Cir. 2004)). Lockhart was terminated because he "admitted that he punched Mr. Maynard in the face, and because this

was not the first time he had been involved in a physical altercation as [Defendants'] employee."[21] CRST's "Serious Misconduct" policy provides in pertinent part:

> Some actions are so serious that a driver may face immediate termination. It is impossible to list all cases of serious misconduct. In the spirit of open, honest communications, some examples have been listed below.
>
> **MAJOR SAFETY VIOLATIONS**
> . . .
>
> 11. Threatening to or assaulting others with bodily harm.

(*See* Lockhart's Appendix at 13, Exhibit 2.) It is undisputed that Lockhart punched Maynard in the face. In 2005, Defendants terminated nineteen employees, including seven white employees, for incidents involving violence.[22] It is also undisputed that in 2004, Lockhart was involved in an altercation with Thomas which involved the police.

Lockhart's claim that he was not at fault for the incident with Thomas, and that he was acting in self-defense when he punched Maynard in the face, does not change the fact that there was an altercation with Thomas and he actually punched Maynard in the face. Furthermore, by punching Maynard, Lockhart violated Defendants' "Serious Misconduct" policy. Other employees, including non-African-American employees, who threatened to

---

[21] *See* Defendants' Appendix at 30.

[22] *See* Defendants' Appendix at 8-23 (Michael Macklin was terminated for hitting his co-driver, Larry Moore was terminated for assaulting his co-driver, Johnny Salters was terminated for making threatening comments to his lead-driver, Bruce Trice was terminated for hitting his girlfriend and ex-girlfriend in a truck yard, Patrick Turner was terminated for punching his co-driver in the face, Mark Wilkes was terminated for assaulting his co-driver on two separate occasions, Deon Allen was terminated for assaulting his co-driver, William Dallis was terminated for fighting with another driver, Samuel Karugu was terminated for assaulting his lead-driver after getting into a verbal argument at a truck stop, Reginald Kelley was terminated for hitting his lead-driver, John Bennet was terminated for threatening to kill co-workers and threatening to beat up his co-driver, and Elbert Bilbrey was terminated for hitting his co-driver).

or assaulted other employees with bodily harm were terminated for such conduct.[23] Even viewing the record in the light most favorable to Lockhart, the Court finds that Lockhart has failed to set forth any facts that other employees who punched other people or were involved in physical altercations were treated differently than he was treated. *See Rodgers*, 417 F.3d at 850-51. Like Lockhart, those other similarly situated employees were also terminated for hitting, fighting, or assaulting other people while on the job. Accordingly, the Court concludes that Lockhart is unable to prove the fourth element of his prima facie case, and therefore, CRST is entitled to summary judgment. *See Riser v. Target Corp.*, 458 F.3d 817, 819 (8th Cir. 2006) ("'We must affirm the grant of summary judgment on a claim if any essential element of [the] prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial.' *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).").

## B. *CRST's Legitimate Non-Discriminatory Reason*

In the alternative, had Lockhart met his burden of establishing a prima facie case of race discrimination, the burden would shift to CRST to articulate a legitimate non-discriminatory reason for terminating him. *See Fair*, 480 F.3d at 870. CRST provided the following non-discriminatory reason for terminating Lockhart: (1) he admitted punching Maynard in the face, and (2) it was not the first time he had been involved in a physical altercation while employed by CRST.[24] Even if Lockhart had established his prima facie case, the Court finds that CRST articulated a legitimate, non-discriminatory reason for its decision to terminate him. Accordingly, the burden would shift back to Lockhart to present evidence that CRST's proffered reason was merely a pretext for intentional discrimination. *Id.*

---

[23] *See* list of terminated employees in footnote 22.

[24] *See* Defendants' Appendix at 30; ¶¶ 4, 5.

## C. Pretext

Lockhart is unable to show that CRST's reason for terminating his employment was pretext for intentional discrimination. "To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff was [his] race." *Twymon*, 462 F.3d at 935 (citation omitted); *see also Johnson v. AT & T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005) ("[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee. [A plaintiff] is also required to show that the circumstances permit a reasonable inference to be drawn that the real reason [a Defendant] terminated him was because of his race.").

Here, CRST terminated Lockhart because he "admitted that he punched Mr. Maynard in the face, and because this was not the first time he had been involved in a physical altercation as [CRST's employee]."[25] Lockhart claims that CRST's proffered reason was pretext for race discrimination. Specifically, Lockhart argues that:

> The evidence of record, including [CRST's] inconsistent explanations surrounding the reason for [Lockhart's] termination and [CRST's] more lenient treatment of other, non-black employees, for involvement in the same or similar conduct, are sufficient to raise material issues of fact regarding [CRST's] true motives behind [Lockhart's] termination.

(*See* Lockhart's Brief at 24.) Again, Lockhart supports his position by claiming that he was not at fault for either the Thomas or Maynard incident. Lockhart contends that he was treated differently than other employees who were involved in altercations and were not at fault for the altercations, because those employees were not terminated.

In *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004), the plaintiff asserted that there was a genuine issue of material fact as to whether he was actually fighting during the incident that led to his termination. The Eighth Circuit Court of Appeals explained that:

---

[25] *See* Defendants' Appendix at 30.

> The difficulty with this contention is that it focuses on the wrong question. The key question in a discrimination case like this one is not whether Hitt was truly fighting, but whether the employer really *believed* that he was fighting, such that the termination was based on a non-discriminatory reason.

*Id.* (citing *Scroggins v. Univ. of Minnesota*, 221 F.3d 1042, 1045 (8th Cir. 2000)); *see also Twymon*, 462 F.3d at 935 ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination.").

It is undisputed that Lockhart punched Maynard in the face. CRST's "Serious Misconduct" policy provides that an employee may be immediately terminated for "[t]hreatening to or assaulting others with bodily harm."[26] In 2005, CRST terminated nineteen employees, including seven white employees, for incidents involving violence.[27] It is clear that CRST believed that Lockhart punched Maynard in the face in violation of their "Serious Misconduct" policy.[28] *Twymon*, 462 F.3d at 935. Having considered the evidence and Lockhart's arguments, the Court finds that Lockhart has failed to show that the circumstances permit drawing a reasonable inference that the real reason CRST terminated him was because of his race. *See Johnson*, 422 F.3d at 763. The Court further concludes that the evidence taken as a whole is "'insufficient to permit a reasonable jury, without resort to speculation, to draw an inference' that [CRST] terminated [Lockhart's] employment because of his race." *Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 859 (8th Cir. 2008) (quoting *Stewart v. Independent School District No. 196*, 481 F.3d 1034, 1045-46 (8th Cir. 2007)). Accordingly, the Court finds that CRST is entitled to summary judgment. *See Anderson*, 477 U.S. at 252 (For summary judgment purposes,

---

[26] *See* Lockhart's Appendix at 13, Exhibit 2.

[27] *See* footnote 22 (list of individuals terminated for fighting, punching, or assaulting other people while on the job).

[28] *See* Brandmayr's Affidavit, ¶ 6 ("Mr. Lockhart admitted that he punched Mr. Maynard in the face."); Defendants' Appendix at 30.

"[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## VI. CONCLUSION

Because Lockhart has failed to prove the fourth element of his prima facie case or present sufficient evidence for a jury to infer that race was a determinative factor in Defendants' termination decision, the Court concludes that Defendants are entitled to summary judgment. Therefore, Defendants' motion for summary judgment is granted.

## VII. ORDER

**IT IS THEREFORE ORDERED AS FOLLOWS**:

1. The Motion for Summary Judgment (docket number 12) filed by Defendants is hereby **GRANTED**.
2. The Petition (docket number 2) filed by Plaintiff on February 5, 2008, is hereby **DISMISSED**.

DATED this 9th day of February, 2009.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA